# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JUSTIN M. HICKOX,<br><br>               Plaintiff,<br><br>    v.<br><br>GALEN GEARHART,<br><br>               Defendant. | CIVIL ACTION NO. 3:19-CV-00828<br><br>(MEHALCHICK, M.J.) |

## **MEMORANDUM OPINION**

Plaintiff Justin M. Hickox brings this civil rights action, pursuant to 42 U.S.C. § 1983, asserting claims against Galen Gearhart, a laundry plant foreman for the State Correctional Facility at Benner Township ("SCI-Benner"). (Doc. 2).[1] Hickox alleges that Gearhart sexually harassed him and then wrongfully terminated him from his job at the laundry plant. (Doc. 2).

Presently before the Court are three motions: (1) Gearhart's motion for dismissal of Hickox's claims under *Poulis v. State Farm Fire and Casualty Co.*, 747 F.2d 863 (3d Cir. 1984), based on allegations that Hickox lied during a deposition and suborned other witnesses' testimony, falsified documents, and made a settlement offer indicating improper motives for pursing this litigation; (2) Hickox's motion for reconsideration of the Court's November 2019 Order denying, in part, his motion to compel discovery; and (3) Hickox's motion for emergency relief by which he seeks an injunction prohibiting prison officials from transferring him from SCI-Benner to another correctional facility and an order directing his release from SCI-Benner's Restricted Housing Unit (RHU). (Doc. 27 (dismissal); Doc. 34

---

[1] Hickox filed his complaint in state court; Gearhart removed the claim to this Court in May 2019. (Doc. 1).

(reconsideration); Doc. 35 (emergency relief)).

For the reasons that follow, (1) Gearhart's motion for sanctions under *Poulis* (Doc. 27) is **GRANTED** to the extent that Hickox is sanctioned, not with dismissal, but with an order precluding Harvey Rose and David Williams from testifying at trial; (2) Hickox's motion for reconsideration of the Court's partial denial of his motion to compel discovery (Doc. 34) is **DENIED**; and (3) Hickox's motion for an injunction preventing his transfer to a different facility and release from the RHU (Doc. 35) is **DENIED AS MOOT**.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. THE COMPLAINT

Hickox's allegations concern the period during which he worked for SCI-Benner's laundry plant – from 2017 until his termination in February 2019. (Doc. 2, at 5). Because of the nature of his position, Hickox was required to submit to a strip search both before and after work at the plant. (Doc. 2, at 6). At least one staff member was present during every strip search. (Doc. 2, at 6). When Gearhart was present, he would "make several comments about [Hickox's] body, body parts and clothing," at times in front of other inmates. (Doc. 2, at 6). Hickox told Gearhart that the comments made him uncomfortable, but Gearhart continued with the same behavior, which spanned over a year, from July 2017 to August 2018. (Doc. 2, at 6).[2] Hickox and other inmates complained to Gearhart's supervisors about the harassment, but the supervisor at the time "failed to rectify the situation." (Doc. 2, at 6).

Hickox alleges that following his verbal complaints, Gearhart "made it known to several other inmates and staff members that [Hickox] was on the 'chopping block' for making

---

[2] There are no allegations of harassment between August 2018 and February 2019.

the complaints." (Doc. 2, at 6). On an unspecified date in February 2019, after undergoing severe cardiac treatment in the morning, Hickox arrived at the laundry plant for his shift only to be sent back to his cell by Gearhart and ultimately terminated without reason. (Doc. 2, at 6-7). When he and "Gearhart were alone, [Hickox] inquired as to why he was being sent back, but Gearhart did not respond. . . . [Hickox] then stated [Gearhart] was only retaliating against him for the verbal complaints, to which Gearhart responded 'Good luck proving it, nobody will believe you because you're an inmate.'" (Doc. 2, at 7). Gearhart issued Hickox a misconduct report, falsely reporting that Hickox had "told [Gearhart] he wasn't allowed to work and that [Hickox] was 'standing around.'" (Doc. 2, at 7). Later, laundry plant staff told Hickox that Gearhart had "terminated him out of retaliation for the sexual harassment complaints." (Doc. 2, at 7).

Based on these allegations, Hickox asserts causes of action for cruel and unusual punishment, sexual harassment, and retaliation. (Doc. 2, at 8-9).

B. D<span style="font-variant:small-caps">eposition</span> T<span style="font-variant:small-caps">estimony</span>

Gearhart's counsel deposed Hickox on July 8, 2019. (Doc. 28-1, at 2). During his deposition, Hickox testified that two of the several inmates who had observed Gearhart's harassing conduct – Harvey Rose and David Williams – provided declarations swearing to their observations. (Doc. 28-1, at 30). Hickox testified that he had asked Rose and Williams to draft declarations but did not help prepare the declarations, instruct them as to what the declarations should contain, consult with them or anyone else while declarants drafted their declarations, or otherwise revise the declarations, which he asserts were wholly original. (Doc. 28-1, at 31-37). On July 15, 2019, Hickox produced two virtually identical typewritten declarations, purportedly made by Rose and Williams on June 9, 2019, and July 7, 2019,

respectively. (Doc. 28, at 13; Doc. 28-1, at 145-148).³

Rose and Williams, SCI-Benner laundry plant employees during the relevant period, were deposed on August 26, 2019. (Doc. 28-1, at 150, 202). Both testified that they drafted their declarations on their own – without assistance from Hickox but with some help from the SCI-Benner law library – and then admitted, after being reminded of the penalty of perjury, that Hickox drafted the declarations. (Doc. 28-1, at 158-161, 187-190, ). Specifically, Williams testified that he typed out his declaration himself, relied on no one for assistance in determining what to write in the declaration, consulted with library staff for help with formatting the declaration but not for content, and did not speak with Hickox about the declaration until after he had drafted it. (Doc. 28-1, at 158-161). After being reminded of the penalty of perjury, however, Williams changed course and stated Hickox wrote every word of his declaration. (Doc. 28-1, at 187-190). Williams further admitted that apart from the allegation in the declaration that he observed "Gearhart making lewd comments towards Mr. Hickox," he had no personal knowledge concerning the declaration's assertions, e.g., that Gearhart fired Hickox out of retaliation for complaints about the harassment. (Doc. 28-1, at 196).

Rose also testified that he drafted his declaration himself. He stated that a librarian assisted him but only with formatting the document, that he did not otherwise discuss with

---

³ In their declarations, Rose and Williams stated that they had been employed at the SCI-Benner laundry plant alongside Hickox; they observed Gearhart sexually harass Hickox by making derogatory comments "about penis size, body type and clothing"; they observed Hickox both complain to Gearhart about the harassment and notify laundry plant supervisor Steven Robinette, who indicated he did not believe Rose or Williams; and they observed Gearhart sexually harass Hickox even after these complaints were made. (Doc. 28-1, at 145-149). Rose additionally stated that he complained to Gearhart and that Gearhart terminated him because of his complaint. (Doc. 28-1, at 148, ¶ 11).

anyone the contents of the declaration before or when he drafted it, and that the contents of the declaration were truthful. (Doc. 28-1, at 211-212). Like Williams, after being reminded of the consequences of perjury, Rose testified, somewhat reluctantly, that, yes, Hickox did help him draft the declaration and in fact wrote the entire document but for paragraph 11. (Doc. 28-1, at 250-253). In that paragraph 11, Rose asserted that shortly after raising concerns about Gearhart's conduct, Gearhart terminated Rose from the laundry plant. (Doc. 28-1, at 148, ¶ 11). Further, like Williams's declaration, Rose's declaration contained allegations, e.g., that Gearhart made comments about Hickox's body, about which Rose was unable to testify to having personal knowledge. (Doc. 28-1, at 221 (testifying that he could not recall any of the comments Gearhart made toward Hickox, which comments Gearhart made under his breath)).

    C.  R<small>EQUEST</small> S<small>LIPS</small>

In response to discovery demands, Hickox produced two documents purported to be request slips he submitted to SCI-Benner complaining about Gearhart's harassment. (Doc. 28-1, at 257-258). The first is dated March 7, 2018, and date-stamped as received on the same date, the second is dated September 18, 2018, and date-stamped as received on September 20, 2018. (Doc. 28-1, at 257-258). Both slips include complaints mirroring those alleged in the instant action, including that Gearhart made comments about Hickox's body during strip searches. (Doc. 28-1, at 257-258).

    D.  S<small>ETTLEMENT</small> D<small>EMAND</small>

Hickox provided Gearhart's counsel with a letter, dated July 23, 2019, offering to settle this case. Specifically, he stated, "I will agree to dismiss the complaint, in its entirety with prejudice, if . . . I be permitted to house with Nicholas Lazor, . . . on GA or FA unit." (Doc. 28-1, at 260). He wrote that he would "rather do the rest of my time in peace with someone I

get along with th[e]n deal with the rest of it in disar[r]ay." (Doc. 28-1, at 260).

## II. MOTION FOR DISMISSAL UNDER *POULIS*

### A. LEGAL STANDARD

A "litigant who provides false documentation and/or untruthful testimony during the course of discovery in an improper attempt to influence the outcome of the civil action may be prohibited by the District Court, pursuant to *Poulis* and Rule 37, from proceeding with the civil action." *Amfosakyi v. Frito Lay, Inc.*, 496 F. App'x 218, 225 (3d Cir. 2012) (affirming imposition of dismissal as a sanction where the record "conclusively establishe[d] that [the plaintiff] falsified a document produced in discovery that was material to his claim of discrimination, and then testified falsely in his deposition regarding that document"); *see also Adesanya v. Novartis Pharm. Corp*, 755 F. App'x 154, 157 (3d Cir. 2018) (affirming dismissal given plaintiff's "false testimony at her deposition, false responses to discovery requests, and refusal to turn over documents"), *cert. denied sub nom. Adesanya v. Novartis Pharm. Corp.*, 139 S. Ct. 1567 (2019).

In determining whether dismissal with prejudice is warranted in such circumstances, the Court must balance six factors enumerated in *Poulis*:

> (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the conduct at issue; (3) a history of dilatoriness; (4) whether the conduct of the party was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

*Amfosakyi*, 496 F. App'x at 225 (citing *Poulis*, 747 F.2d at 868).

The *Poulis* factors are not "a magic formula whereby the decision to dismiss or not to dismiss a plaintiff's complaint becomes a mechanical calculation." *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992). No one factor is determinative, and dismissal may be ordered even when

one or more *Poulis* factors are not met. *Mindek*, 964 F.2d at 1373; *Hicks v. Feeney*, 850 F.2d 152, 156 (3d Cir. 1988). Dismissal is a "drastic sanction" because it is "an adjudication on the merits, barring any further action between the parties." *Sebrell ex rel. Sebrell v. Phila. Police Dep't*, 159 F. App'x 371, 373 (3d Cir. 2005) (citing *Landon v. Hunt*, 977 F.2d 829, 833 (3d Cir. 1992); Fed. R. Civ. P. 41(b)).

    B.  A<span style="font-variant:small-caps">NALYSIS</span>

While the Court must address the *Poulis* factors in determining whether to dismiss this claim, it must first be determined whether Gearhart has sufficiently established the bases for sanctions, i.e., that Hickox falsely testified and suborned witnesses' testimony, generated false documents in response to a discovery demand, and is suing for improper motives. Hickox concedes that he drafted the declarations but asserts that he drafted them *after* his deposition based on written declarations, which "appeared to be typed and worded by a child," provided by Rose and Williams. (Doc. 29, at 5). He also argues that the request slips are authentic and that his settlement offer did not reveal improper litigation motives, particularly given that he had made a prior settlement offer for his reinstatement as a laundry plant employee and removal of the "falsified misconduct [] from his record." (Doc. 29, at 6-8).

Regarding Hickox's deposition testimony, the Court is not persuaded by Hickox's assertion that, at the time of his deposition, he had not yet drafted (or redrafted) the declarations that were the subject of Rose's and Williams's depositions. First, as dated, the documents appear to have been created and signed *before* Hickox's deposition – at the very least, Hickox would have updated the dates on the revised/redrafted declarations when asking Rose and Williams to resign them. Second, at no point during their depositions did Rose and Williams testify that they drafted a declaration and provided it to Hickox, who then

redrafted the declarations. Third, Williams testified to having no personal knowledge of the assertion in the declaration that Gearhart retaliatorily terminated Hickox, belying Hickox's assertion that he merely reworded a declaration that Williams had previously provided to him.[4] Fourth, the testimony of Rose and Williams, both of whom asserted then disclaimed authorship of their declarations, tends to suggest that Hickox had a role in coaching these witnesses to testify untruthfully and in a remarkably similar pattern. Fifth, when Gearhart's counsel asked Rose whether Hickox was lying when he said during his deposition that he did not assist with drafting the declarations, Hickox interjected, stating, in part, "[t]his is not my deposition," implying, it seems, that the question was improper. (Doc. 28-1, at 251 ("Feel free to depose – re-depose if you like. I mean, you can ask for another continuance and schedule that at a later time.")). Even if the question was objectionable, Hickox could have easily clarified, as he does now, that he redrafted the declarations *after* his deposition – or, he could have let Rose answer the question (or some version of the question), in which case Rose could have stated, as Hickox appears to assert he would have, that he provided an original declaration that Hickox subsequently rewrote. Sixth, Hickox alleges that he destroyed the original declarations to avoid confusion; he therefore cannot provide proof of their existence. Thus, while not conclusive beyond all doubt, the record strongly suggests that Hickox falsely testify when he stated at his deposition that he did not assist Rose or Williams with their declarations.

---

[4] Even if Hickox did receive a draft declaration from these witnesses, Hickox falsified the declarations by adding certain allegations about which Williams had no knowledge, *see supra*. In his opposition papers, Hickox asserts that he "took the wording from the declarations and made them more presentable," but Rose's and Williams's testimony is patently contradictory. (Doc. 29, at 5).

Moving to the request slips, Gearhart has submitted an affidavit by Holly Quist, an SCI-Benner Superintendent's Assistant, who has "access to records routinely maintained during the operation of SCI-Benner, including DC-135A Inmate Request to Staff Member forms." (Doc. 28-2, at 1). Quist reviewed the request slips and has "serious concerns regarding the[ir] authenticity" for three reasons: (1) "SCI-Benner has no independent record of ever having received the documents"; (2) neither document "contain[s] the response of a staff member," whereas Quist "can think of no reason how or why [] Hickox would obtain possession of Form DC-135A requests stamped 'Received' by [her] office that did not also contain a staff response"; and (3) "the 'Received' stamp on the document dated March 7, 2018 is not in the form used by [Quist's] office." (Doc. 28-2, at 1-2).

The Court finds Quist's affidavit persuasive. Hickox argues that (1) Quist could not possibly have first-hand knowledge about whether his slips, of the countless her office receives, were actually submitted; (2) "[i]t is routine for [Hickox] to receive request slips back from her office without response"; (3) the "[f]ailure to answer and return request slips is commonplace at SCI-Benner"; and (4) he has no access to stamps used by SCI-Benner. (Doc. 29, at 3). While the Court cannot, on the present record, determine that all Hickox's assertions in this regard are wholly meritless, Hickox has failed to adequately rebut Quist's concerns about the authenticity of his request slips. As for his access to facility stamps, Hickox provided copies of unrelated grievances – date-stamped as filed – to rebut Quist's assertion that his request slips bear inauthentic date-stamps. (Doc. 30, at 3-4). While Hickox is correct that the date-stamp reflected on these grievances matches the date-stamp on *one* of the request slips he produced (the later-filed one, dated September 2018), the same is not true of his March 2018 request slip, which bears a different date-stamp. (Doc. 28-1, at 257-258). He fails to address

the March 2018 slip, nor does he argue that the date-stamp thereon is the one used by Quist and her office. (Doc. 29, at 3, 7). Considering all the arguments and the record, the Court is compelled to credit Quist's assertion regarding her "serious concerns" about the slips' authenticity.

Finally, as to Hickox's settlement demand for a housing arrangement with another inmate, the Court finds such a demand insufficient to establish that Hickox is litigating for an improper motive. Hickox sought money damages in his complaint and asserts that he submitted an earlier settlement demand, not mentioned by Gearhart in his papers, seeking reinstatement of his position in the laundry plant. He also asserted, in part, that "at the time . . . [he] was housed with an elderly inmate who did not shower, did not clean the living area, had rotten meat in his locker, under his bed and under his pillow, [and] had not changed his sheets in weeks." (Doc. 30, at 7). Under these circumstances, the Court is not inclined to infer an improper litigation motive on Hickox's part.

Against this background, the Court turns to the *Poulis* factors. The first, second, and fourth factors (personal responsibility, prejudice, and willfulness or bad faith) weigh in favor of dismissal. First, Hickox is solely responsible for the conduct at issue here. *See, e.g.*, *Stafford v. Derose*, No. 3:09-CV-00346, 2015 WL 1499833, at *3 (M.D. Pa. Apr. 1, 2015). Second, although Hickox's conduct has not prejudiced Gearhart in the context of this specific case, prejudice here arises from the "impact of the fraudulent conduct on the judicial system and the threat it poses to the integrity of the Court." *See Stafford*, 2015 WL 1499833, at *3. Third, it cannot be seriously doubted that Hickox's miconduct was willful and done in bad faith. The Court cautions, however, that its conclusion concerning willfulness and bad faith does not apply to the conduct of Rose and Williams. As indicated herein, *infra*, there is no conclusive

evidence that Hickox coerced or directly instructed these witnesses to testify falsely; rather, the evidence of Hickox's involvement in shaping their testimonies is circumstantial. Moreover, Hickox did not merely craft the declarations from baseless untruths, as much of the declarations' content accords with the declarants' deposition testimony. For example, while Hickox clearly engaged in willful bad faith conduct when he declared, e.g., Williams's personal knowledge that Gearhart terminated Hickox for complaining about the harassment, the same cannot be said of other conduct that Williams purports to have observed.

Regarding the third and sixth factors (dilatoriness and meritoriousness), on balance, these factors weigh neither against nor in favor of dismissal. Beginning with the third factor, the Court notes that "conduct that occurs one or two times is insufficient to demonstrate a 'history of dilatoriness,'" and in this case the only established incidents of Hickox's misconduct are his deposition testimony and the request slips. *See Briscoe v. Klaus*, 538 F.3d 252, 261 (3d Cir. 2008). Nevertheless, there are other incidents of misconduct that, although not conclusively established by the record alone, the Court has considered in finding the record equivocal as to these factors. For example, the manner in which Rose and Williams testified – disclaiming Hickox's help with the declarations only to testify that Hickox drafted the declarations – provides strong circumstantial evidence that Hickox instructed these witnesses to perjure their testimony. As for the sixth factor, Gearhart's showing is insufficient to establish that Hickox's claim lacks merit. As Gearhart notes, the "merits of [Hickox]'s claim are unknown at this time" because success on his claim will turn on credibility findings, i.e., whether a factfinder believes Gearhart or Hickox (or other potential witnesses). (Doc. 28, at 19). Taking Hickox's allegations as true, it cannot be said that his claim of sexual harassment is entirely without merit. However, as the merit of Hickox's case hinges on his

evidence that Hickox coerced or directly instructed these witnesses to testify falsely; rather, the evidence of Hickox's involvement in shaping their testimonies is circumstantial. Moreover, Hickox did not merely craft the declarations from baseless untruths, as much of the declarations' content accords with the declarants' deposition testimony. For example, while Hickox clearly engaged in willful bad faith conduct when he declared, e.g., Williams's personal knowledge that Gearhart terminated Hickox for complaining about the harassment, the same cannot be said of other conduct that Williams purports to have observed.

Regarding the third and sixth factors (dilatoriness and meritoriousness), on balance, these factors weigh neither against nor in favor of dismissal. Beginning with the third factor, the Court notes that "conduct that occurs one or two times is insufficient to demonstrate a 'history of dilatoriness,'" and in this case the only established incidents of Hickox's misconduct are his deposition testimony and the request slips. *See Briscoe v. Klaus*, 538 F.3d 252, 261 (3d Cir. 2008). Nevertheless, there are other incidents of misconduct that, although not conclusively established by the record alone, the Court has considered in finding the record equivocal as to these factors. For example, the manner in which Rose and Williams testified – disclaiming Hickox's help with the declarations only to testify that Hickox drafted the declarations – provides strong circumstantial evidence that Hickox instructed these witnesses to perjure their testimony. As for the sixth factor, Gearhart's showing is insufficient to establish that Hickox's claim lacks merit. As Gearhart notes, the "merits of [Hickox]'s claim are unknown at this time" because success on his claim will turn on credibility findings, i.e., whether a factfinder believes Gearhart or Hickox (or other potential witnesses). (Doc. 28, at 19). Taking Hickox's allegations as true, it cannot be said that his claim of sexual harassment is entirely without merit. However, as the merit of Hickox's case hinges on his

evidence that Hickox coerced or directly instructed these witnesses to testify falsely; rather, the evidence of Hickox's involvement in shaping their testimonies is circumstantial. Moreover, Hickox did not merely craft the declarations from baseless untruths, as much of the declarations' content accords with the declarants' deposition testimony. For example, while Hickox clearly engaged in willful bad faith conduct when he declared, e.g., Williams's personal knowledge that Gearhart terminated Hickox for complaining about the harassment, the same cannot be said of other conduct that Williams purports to have observed.

Regarding the third and sixth factors (dilatoriness and meritoriousness), on balance, these factors weigh neither against nor in favor of dismissal. Beginning with the third factor, the Court notes that "conduct that occurs one or two times is insufficient to demonstrate a 'history of dilatoriness,'" and in this case the only established incidents of Hickox's misconduct are his deposition testimony and the request slips. *See Briscoe v. Klaus*, 538 F.3d 252, 261 (3d Cir. 2008). Nevertheless, there are other incidents of misconduct that, although not conclusively established by the record alone, the Court has considered in finding the record equivocal as to these factors. For example, the manner in which Rose and Williams testified – disclaiming Hickox's help with the declarations only to testify that Hickox drafted the declarations – provides strong circumstantial evidence that Hickox instructed these witnesses to perjure their testimony. As for the sixth factor, Gearhart's showing is insufficient to establish that Hickox's claim lacks merit. As Gearhart notes, the "merits of [Hickox]'s claim are unknown at this time" because success on his claim will turn on credibility findings, i.e., whether a factfinder believes Gearhart or Hickox (or other potential witnesses). (Doc. 28, at 19). Taking Hickox's allegations as true, it cannot be said that his claim of sexual harassment is entirely without merit. However, as the merit of Hickox's case hinges on his

credibility, which, given his conduct, has been cast into doubt, the Court finds that the merit factor simply does not weigh in favor of either party's position.

Finally, the fifth *Poulis* factor, which requires the Court to consider the effectiveness of sanctions other than dismissal, weighs against dismissal. Because the record is not *conclusive* as to all the misconduct asserted by Gearhart, dismissal is not warranted in light of less severe available sanctions. The Court's analysis is two-fold on this score. First, unlike cases in which claims are dismissed for discovery frauds based on *conclusive* evidence, Gearhart has established only *some* conclusively fraudulent conduct coupled with evidence strongly suggesting fraud. *Cf. Stafford*, 2015 WL 1499833, at *2 (dismissing claim based on plaintiff's admission that he wrote a note, falsely attributed the note to another, and forged that person's signature); *Amfosakyi v. Frito Lay*, No. 1:11-CV-651, 2011 WL 7560658, at *2 (M.D. Pa. Dec. 22, 2011), *report and recommendation adopted*, No. 1:11-CV-00651, 2012 WL 928139 (M.D. Pa. Mar. 19, 2012), *aff'd sub nom. Amfosakyi v. Frito Lay, Inc.*, 496 F. App'x 218 (3d Cir. 2012) (dismissing claim where plaintiff admitted to making false statement); *Adesanya v. Novartis Pharm. Corp.*, No. 213CV05564SDWSCM, 2016 WL 4401522, at *6 (D.N.J. Aug. 15, 2016) (finding dismissal warranted where plaintiff's deposition testimony was conclusively proven false by "contradictory information uncovered by defense counsel"), *aff'd sub nom. Adesanya v. Novartis Pharm. Corp*, 755 F. App'x 154 (3d Cir. 2018).

Second, there are lesser sanctions that the Court has determined will be effective to deter similar future conduct, namely precluding Rose and Williams from testifying for Hickox at trial. The Court has arrived at this conclusion upon close consideration of the record and a careful weighing and assessment of the *Poulis* factors. Critical in this regard is the fact that Hickox did not merely concoct declarations out of thin air; the declarants had at least some

personal knowledge regarding the contents of the declarations. Also significant is Gearhart's inability to conclusive establish, at this stage, that Hickox falsely asserted he submitted his request slips and that the slips bear inauthentic stamps.

Because the Court is not dismissing Hickox's claim altogether, it now turns to Hickox's motions for reconsideration and an emergency injunction and order.

### III. MOTION FOR RECONSIDERATION

By Order dated November 21, 2019, the Court granted Hickox's motion to compel discovery to the extent of ordering Gearhart to produce his personnel records[5] for an *in camera* review but declined to compel the production of four items of discovery: (1) Hickox's inmate file; (2) video surveillance from date on which Gearhart terminated Hickox; (3) information relating to Gearhart's alleged assault of an inmate in June 2019; and (4) video surveillance of the "C.I. Laundry Clean Process Area" from 36 dates between February and June 2019. (Doc. 17 (motion to compel); Doc. 18, at 2-4 (brief in support); Doc. 32, at 3 (Nov. 2019 Order)). Specifically, the Court denied Hickox's motion to compel these items based on the following rationales:

> First, Hickox's request for his entire inmate file is overbroad and burdensome, and he has provided no grounds for requesting the file apart from asserting that "this is a normal request that would be expected in an inmate lawsuit." (Doc. 18, at 2). Second, the declaration of Superintendent's Assistant Holly Quist, annexed as an exhibit to Gearhart's opposition papers, indicates that the video Hickox seeks from the date he was terminated does not exist. (Doc. 19-3, at 2–3). Third, Gearhart's alleged assault of an inmate in June 2019 is not relevant to Hickox's claim that he was harassed and then retaliatorily terminated in February 2019. Fourth, Hickox's request for 36 days of video surveillance—depicting events that occurred after the incidents for which he seeks relief—is

---

[5] Gearhart's counsel since filed a letter, in December 2019, asserting that he "reviewed [] Gearhart's personnel file and hereby certify that there is nothing in the file that reflects prior complaints of sexual harassment made against [] Gearhart and/or any disciplinary action taken in response thereto." (Doc. 33).

vague, irrelevant, burdensome, and overbroad.

(Doc. 32, at 3).

Hickox now moves for reconsideration of the Court's partial denial of his motion to compel. (Doc. 34). Initially, Hickox has failed to comply with Local Rule 7.5, which provides, in pertinent part, that "[i]f a supporting brief is not filed within . . . [fourteen (14) days after the filing of any motion], the motion shall be deemed to be withdrawn." Nevertheless, because Hickox is proceeding *pro se*, the Court will address the reasons for which his motion lacks merit. *See, e.g.*, *Hill v. Derrick*, No. 4:05-CV-1229, 2006 WL 8449048, at *1 (M.D. Pa. Jan. 10, 2006) ("Under the Local Rule, Hill's failure to file a timely brief deems those motions withdrawn. As Hill is proceeding *pro se* we will also address why Hill's motions have no merit.").

Turning to the merits, a motion for reconsideration is a device of limited utility which may only be used to correct manifest errors of law or fact or to present newly discovered precedent or evidence. *Harasco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). To prevail, a party seeking reconsideration must demonstrate one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . . ; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

Here, Hickox advances the same arguments he raised in his initial motion to compel, points to no changes in controlling law or new evidence unavailable at the time of his initial motion, and raises no arguments indicating the Court committed a clear error of law or fact. (Doc. 34, at 3). Hickox does not appear to argue that the Court erred in denying his motion

to compel production of his inmate file and video surveillance from the date Gearhart terminated Hickox. (Doc. 34, at 3). He does argue, as he did in his initial motion to compel, that information pertaining to Gearhart's alleged *physical* assault of an inmate in June 2019 "would clearly show [Gearhart] believes he can treat an inmate however he feels. This would show his mindset." (Doc. 34, at 3). However, any such conduct – even if true – is irrelevant to Hickox's allegations that Gearhart verbally harassed him from 2017 to 2018 and then terminated him in February 2019. Hickox also argues, again as he did in his initial motion, that the 36 days of video surveillance following his termination would "show the mindset of [Gearhart] when he engaged with [Hickox] because the video would show he did not discipline others the way he did [Hickox], for the same thing, even after the fact." (Doc. 34, at 3). This request, however, is irrelevant, burdensome, and overbroad, and the Court committed no clear error in denying this aspect of Hickox's motion to compel.

Hickox's motion for reconsideration is therefore denied.

## IV. MOTION FOR EMERGENCY RELIEF

On January 6, 2020, Hickox moved for injunction prohibiting prison officials from transferring him to a different facility and for an order directing his release from SCI-Benner's RHU. (Doc. 35, at 1). In his motion, Hickox alleged that the transfer was initiated in retaliation for his complaints, grievances, and commencement of this action and, as such, constitutes a violation of his First Amendment rights. (Doc. 35, at 1-2).

On January 31, 2020, Hickox filed a change of address form indicating he was transferred and is no longer housed at SCI-Benner. (Doc. 37).

Because he is no longer an SCI-Benner inmate, Hickox's motion for an injunction preventing his transfer from SCI-Benner and for an order releasing him from SCI-Benner's

RHU is moot and is therefore denied on that ground.

## V. CONCLUSION

For the foregoing reasons, Gearhart's motion for sanctions (Doc. 27) is **GRANTED** to the extent that Hickox is precluded from calling Harvey Rose and David Williams to testify at his trial; Hickox's motion for reconsideration of the Court's November 21, 2019 Order (Doc. 34) is **DENIED**; and Hickox's motion for an injunction preventing his transfer to a different facility and for his release from the RHU (Doc. 35) is **DENIED AS MOOT**.

An appropriate Order will follow.

Dated: April 13, 2020   *s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**United States Magistrate Judge**